**In re Gerald J. HOBBS, and Jacquelyn NMI Hobbs, Debtors.**

**Gerald J. HOBBS and, Jacquelyn NMI Hobbs, Movants,**

v.

**GURLEY MOTOR COMPANY, Respondent.**

**Bankruptcy No. 95–02972–PCT–RGM.**

United States Bankruptcy Court, D. Arizona.

Feb. 4, 1997.

Charles M. Sabo, Charles M. Sabo, P.C., Tempe, AZ, for Debtors.

Ronald J. Ellett, Law Offices of Ronald J. Ellett, P.C., Phoenix, AZ, for Gurley Motor Company.

Ralph McDonald, Chapter 13 Trustee, Phoenix, AZ.

## AMENDED MEMORANDUM DECISION

SARAH SHARER CURLEY, Bankruptcy Judge.

### I. INTRODUCTION

This matter comes before the Court on a Motion for Valuation of Security filed by Gerald and Jacquelyn Hobbs (the "Debtors") regarding their 1993 Mercury Tracer. The Debtors filed their motion on February 21, 1996. In May, 1996, Gurley Motor Company ("Gurley") and the Debtors filed a memorandum of points and authorities regarding the appropriate valuation standard to be applied to the 1993 Mercury Tracer. On July 1, 1996, this Court heard oral argument and, thereafter, took this matter under advisement.

In this Memorandum Decision, this Court has set forth its findings of fact and conclusions of law pursuant to Rule 7052 of the *Rules of Bankruptcy Procedure.* The issues addressed herein constitute a core proceeding over which this Court has jurisdiction. 28 U.S.C. §§ 1334 and 157.

### II. FACTUAL BACKGROUND

Gurley is a retailer of automobiles and sometimes finances the sale of automobiles in its inventory. The Debtors purchased a 1993 Mercury Tracer ("vehicle") from Gurley. Gurley took a purchase money security interest in the vehicle, as Gurley had financed the $13,927.44 paid by the Debtors. About six months later, when the present case was filed

on April 11, 1995, the Debtors still owed Gurley approximately $9,000 pursuant to the loan documentation.

On September 25, 1996, the Debtors filed their First Amended Chapter 13 Plan ("Plan"). The Plan proposed to bifurcate Gurley's claim into a secured and an unsecured portion. Under the plan, Gurley would have a secured claim of $5,600, which would be paid in full, with the balance to be classified and paid as an unsecured claim. Gurley objected to this treatment, taking the position that it was entitled to a secured claim of $7,680, with the balance to be classified and paid as an unsecured claim.

The validity of Gurley's security interest in the vehicle is not disputed. The parties have stipulated that, as of the valuation hearing and according to the *Kelly Blue Book,* the vehicle's wholesale value is $5,600 and the retail value is $7,680.[1] The parties have presented no other evidence as to the value of the vehicle.

## III. DISCUSSION

■ The only issue to be resolved by this Court is whether a retail standard should apply to the valuation of the 1993 Mercury Tracer because Gurley is a retailer of automobiles. Because the appropriate standard will determine the amount of the secured portion of Gurley's proof of claim, Gurley argues that its status as a retailer warrants the higher valuation standard, whereas the Debtors contend that the Court must apply a more objective standard and the lower, wholesale valuation standard applies.

The Bankruptcy Code provides the starting point for the analysis. 11 U.S.C. § 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest

... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a) (1996). Here, the "purpose of the valuation" is to determine the amount of Gurley's secured claim so as to establish the minimum amount that the Debtors must pay to Gurley under their Plan pursuant to 11 U.S.C. § 1325(a)(5)(B). According to the Plan, the "proposed disposition or use of the property" is retention of the car by the Debtors for their personal use.

The opinion of *General Motors Acceptance Corp. v. Mitchell (In re Mitchell),* 954 F.2d 557 (9th Cir.1992), *cert. denied,* 506 U.S. 908, 113 S.Ct. 303, 121 L.Ed.2d 226 (1992), must first be considered. In *Mitchell,* the secured creditor, General Motors Acceptance Corp. ("GMAC"), argued that in a Chapter 13 "cram down" situation, where the debtor intended to keep the vehicle as part of the plan of reorganization, the debtor must pay the replacement cost, or retail value, of the vehicle as the secured portion of the claim. *Id.* The *Mitchell* court rejected this argument and instead focused on the value of the creditor's interest in the property, not the debtor's interest. *Id.* The Mitchell court then stated the "general rule," concluding that "[i]t would appear to be the wholesale price which best approximates [the] value [of the creditor's interest]." *Id.*[2]

The Ninth Circuit has recently revisited its analysis in *Mitchell* in the decision of *Taffi v. United States (In re Taffi),* 96 F.3d 1190 (9th Cir.1996). In *Taffi,* the Ninth Circuit considered the appropriate method by which to value property that would be retained by the debtor pursuant to a Chapter 11 plan of reorganization. The Court then stated that in a Chapter 11 case, *or a Chapter 13,* if the debtor proposes to retain the property pursuant to a plan, the trial court should not

---

1. On September 11, 1995, Gurley filed a proof of claim alleging that the vehicle had a value of $9,014.64 on the date the bankruptcy petition was filed. The Debtors objected to this proof of claim. Presumably the reduction in the retail value of the collateral, as claimed by Gurley, between the filing date and the valuation hearing date is attributable to market conditions or further negotiations between the parties.

2. After a rehearing *en banc,* the Fifth Circuit now utilizes the wholesale price for the value of the vehicle. *See Associates Commercial Corp. v. Rash (In re Rash),* 90 F.3d 1036 (5th Cir.1996).

analyze the valuation of the property under Section 506(a) as if the creditor were going to foreclosure and sell the collateral. *Id.* at 1192. Therefore, hypothetical sale costs should not be considered. *Id.* The Court also concluded that the replacement value of the property was inapposite, since the property was not being replaced. *Id.* The Court concluded that the fair market value of the property was the "price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property [had] been exposed to the market for a reasonable time." *Id.*

■ The Ninth Circuit then overruled *Mitchell* to the extent that *Mitchell* held the valuation of a vehicle for Section 506(a) purposes should be predicated on "what the creditor would obtain if the creditor were to make a reasonable disposition of the collateral." *Id.* at 1193 (quoting *Mitchell,* 954 F.2d at 560). The Ninth Circuit then stated that it took no position as to whether the fair market value of the automobile was the high or low blue book value. *Id.* The *Taffi* decision now causes this Court to reexamine and ascertain the appropriate method of determining the fair market value of the vehicle.

Decisions such as *Valley Nat'l Bank of AZ v. Malody (In re Malody),* 102 B.R. 745 (9th Cir. BAP 1989) and *In re Angel,* 147 B.R. 48 (Bankr.D.Idaho 1992) have necessarily relied, in part, on what the creditors would receive if they were permitted to sell the vehicles in a commercially reasonable manner. This should no longer be a factor. In *Malody,* the Panel also considered the disparity in the bargaining position between the secured creditor and the debtors and noted the debtors should be accorded some latitude in that respect. *Malody,* 102 B.R. at 749. In the *Angel* decision, the bankruptcy court stated that a creditor should not receive a higher valuation for the car "merely because the creditor happens to have the peculiar ability to dispose of the collateral." *Angel,* 147 B.R. at 49.

In yet another recent analysis, the Court in the decision of *In re Maddox,* 194 B.R. 762, 765 (Bankr.D.N.J.1996), noted that bankruptcy courts had developed three approaches to valuing a vehicle in a "cram down" scenario: wholesale, retail, or the average of the two. In reviewing the second sentence of Section 506 as to the "proposed disposition or use of such property," the court stated that the "debtor's retention and use of the collateral is relevant only to the extent that such continued use impacts upon the value of the creditor's interest in the collateral." *Id.* at 768. If the vehicle experiences only normal wear and tear, then the depreciation of the vehicle may be set off or equalized by insurance on the vehicle, maintenance, and any payments received by the creditor pursuant to the plan. *Id.* Such a factor normally dictates a lower value or low bank value for the vehicle.

■ Reviewing *Malody, Angel* and *Maddox* in light of the *Taffi* decision, this Court should consider such factors as the disparity in the bargaining positions of the parties, whether the creditor is receiving payments under a plan and other benefits which will compensate the creditor for any depreciation of the vehicle through use, and whether the unusual use of the vehicle (be it extremely beneficial or detrimental) requires a different approach to valuation. As the Court in *Angel* noted, the market position of the creditor as a retailer of automobiles should no longer be a factor. *Angel,* 147 B.R. at 49.

This Court shall apply these and other factors in determining what is the next step in this litigation.

First, this Court notes that the Debtors own the vehicle in question, and the interest of Gurley is that of a lienholder on the vehicle.

Next, the Court concludes that the Debtors intend to keep the vehicle and that this valuation hearing is being conducted for purposes of "*cram down*" at a confirmation hearing on the Debtors' plan of reorganization. *See* 11 U.S.C. § 1325(a)(5)(B)(ii).[3]

---

**3.** 11 U.S.C. § 1325(a)(5)(B)(ii) provides the following:

    (a) Except as provided in subsection (b), the court shall confirm a plan if—

      \*    \*    \*    \*    \*    \*

    (5) with respect to each allowed secured claim provided for by the plan—

      \*    \*    \*    \*    \*    \*

    (B)(ii) the value, as of the effective date of the plan, of property to be distributed under

The parties herein have not stipulated as to whether the property is essential to the Debtors' plan of reorganization. However, the Court has independently reviewed the Debtors' Schedules,[4] which reflect that the Debtor Gerald Hobbs is currently employed with Chinle Unified School District as a mechanic and that Debtor Jacquelyn Hobbs is not employed outside the home.[5] In this case, the Debtors do not require the vehicle to confirm their plan of reorganization.

Concerning the relative disparity in bargaining positions discussed in *Malody*, there is no question that Gurley, as a retailer of automobiles in Northern Arizona, enjoys a substantial advantage over the Debtors.

From a policy standpoint, distinguishing between a low and high blue book valuation standard on the basis of whether a particular debtor financed the purchase of a car with a financial institution or the automobile dealer seems incongruous. As the *Angel* court noted, the creditor's "peculiar ability to dispose of the collateral" should be irrelevant. *See Angel*, 147 B.R. at 49. The automobile dealer uses a market rate of interest based upon the credit history and other risk factors associated with a debtor when making a loan—just as a financial institution does. Following the same procedure as a financial institution, the automobile dealer also considers such factors as the amount of the loan, the value of the vehicle, and the term of the loan in determining the interest rate for a debtor. However, the automobile dealer most likely has not considered the fortuitous event of receiving a greater value; that is, the retail, or high blue book, value for its secured claim in the Chapter 13 plan. The fair market value of the vehicle should be based upon market conditions, not the unique position of the creditor in the market. To focus on the creditor's position transforms a relatively objective test of valuation into a subjective analysis: What could this specific creditor receive if it were permitted to dispose of the vehicle?

The *Maddox* decision also correctly focuses on the point that a creditor normally does not suffer a loss during the course of the debtor's plan, because the debtor maintains insurance on the vehicle, the vehicle has routine maintenance, and the debtor is also providing payments to the creditor through the plan, all of which equal the depreciation on the vehicle over the course of the plan. *See Maddox*, 194 B.R. at 768. Therefore, the debtor's retention of the vehicle should not necessarily dictate a high blue book value for the property. In this case, the parties have presented no evidence of any unusual use of the vehicle which would dictate a higher range for the fair market value of the vehicle.

This Court is reluctant to adopt, without further investigation, the high or low blue book value of the vehicle as stipulated to by the parties. The fair market value of the vehicle is rarely the low blue book, or wholesale, value or the high blue book, or retail, value. Various appraisers testifying at hearings before this Court have considered a variety of factors in determining the fair market value of a vehicle. For instance, the appraisers view the actual condition of the vehicle that is the subject of the controversy, the actual costs of repairs to said vehicle, and the auction market in Arizona to determine the fair market value.[6]

## IV. CONCLUSION

Based upon the foregoing, this Court must conduct an evidentiary hearing to resolve the

the plan on account of such claim is not less than the allowed amount of such claim[.]

4. The Court may always review its own files to determine a matter. *O'Rouke v. Seaboard Surety Co. (In re E.R. Fegert, Inc.)*, 887 F.2d 955, 957–58 (9th Cir.1989).

5. *See* Statement of Affairs and Schedules, Docket Entry No. 6, and Schedule I—Current Income of Individual Debtor(s).

6. In determining the fair market value of a vehicle, the bankruptcy court considers the Arizona auction market as one indication. The Arizona auction market actually fluctuates concerning the value of a vehicle, depending on the number of similar vehicles being auctioned in a given month, the current popularity of the vehicle with the buying public (i.e., a 1986 Buick Riviera may be more popular with the buying public at certain times), and the prohibitive costs in repairing certain vehicles.

factual and legal issues outlined herein. The Court will analyze the various factors outlined in this decision in determining the appropriate fair market value of the vehicle. The Court will execute a separate order incorporating this Memorandum Decision.